**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**CHICAGO DIVISION**

| | |
|---|---|
| JIM PSOMAS, individually and on behalf of all others similarly situated,      ) <br> ) <br> ) <br> Plaintiff,    ) <br> ) <br> ) <br> v.    ) <br> ) <br> ) <br> CHICAGO TRANSIT AUTHORITY,    ) <br> ) <br> Defendant.    ) <br> ) <br> ) <br> ) <br> ) <br> ) | Case No. 1:24-cv-12173 <br><br> COMPLAINT <br><br> ***Jury Trial Demanded*** |

**CLASS ACTION COMPLAINT**

Plaintiff Jim Psomas ("**Plaintiff**"), for himself and on behalf of all others similarly situated, allege, upon personal knowledge as to himself and upon information and belief as to others, as follows:

**INTRODUCTION**

1.    This is a class action brought by a former employee of the Chicago Transit Authority ("**CTA**" or "**Defendant**"), alleging that the Defendant violated the Americans with Disabilities Act, 42 U.S.C. § 12101**,** *et seq.* ("**ADA**") by engaging in a comprehensive pattern and practice of disability-based discrimination relating to its COVID-19 vaccination mandate (the "**Mandate**" or "**vaccination mandate**").

2.    The gravamen of this Complaint is that CTA discriminatorily denied more than 120 medical accommodation requests without consideration of potential accommodation—determining beforehand that it would not allow disability-based accommodations for Plaintiff and those similarly situated.

3.    A prime example is the named plaintiff here: Jim Psomas.  Mr. Psomas suffers from Hashimoto's Disease—a rare autoimmune disorder linked to thyroid deficiency that affects every part of his daily life.  His condition is exacerbated by heart palpitations and, during the relevant timeframe, a significant chance of cancer.

4.    At his doctor's direction (who suggested waiting to see if vaccination would be appropriate) and after consultation with his medical team at the Endocrinology Division of the Mayo Clinic, Mr. Psomas informed CTA that he could not receive a COVID-19 vaccine.

5.    As he explained to CTA, Mr. Psomas could seamlessly have received accommodations such as remote work or weekly testing and following of mask rules (as other employees did for months prior to termination).

6.    Unsurprisingly, though, CTA denied Mr. Psomas's request for an accommodation, absurdly claiming—in what appears to be an obvious form denial statement—that he "did not

specify a reason why [he] was medically unable to receive the COVID-19 vaccination or how [his] medical condition [wa]s contraindicated to the COVID-19 vaccination."

7.    It was unsurprising because several months earlier, Mr. Psomas had already been in a meeting where he was told that CTA would not be "tracking" any testing for unvaccinated individuals in the company because there would not be any unvaccinated employees.

8.    In other words, CTA had already made the decision to rid itself of all unvaccinated employees, no matter the reason why they had not taken the COVID-19 vaccine.  As a result of this policy, CTA denied virtually all requests for accommodation (both medical and religious).  As of February 2022, CTA had granted no requests for an accommodation (either medical or religious) and ultimately only "granted" accommodations to those employees CTA had not yet terminated when the policy began to be rescinded.  On information and belief, there was one (1) medical accommodation granted out of more than 130 requests.

9.    These are the kinds of "companywide policies" and "consistent practices" that the Supreme Court has held invite class action treatment.  *Wal-Mart Stores v. Dukes*, 564 U.S. 338 (2011). When a company discriminates against large swaths of its employees at once, it should not be surprised to find itself defending against all the mistreated employees at once. This case fits comfortably within Federal Rule of Civil Procedure ("**FRCP**") Rule 23.

10.    Ironically, though, because the stated justification for the mass termination was "workplace safety" purportedly attributable to unvaccinated employees, CTA was highly inefficient in terminating unvaccinated employees, taking up to nine months to rid itself of unvaccinated employees—long into the time period when everyone knew the ineffectiveness of the vaccines against the Delta variant, the inability of the vaccines to stop the spread of COVID, and the strength of natural immunity against the disease.

11.     In that interim period, CTA accommodated scores of unvaccinated employees by having them mask while at work and submit to weekly testing, demonstrating conclusively its ability to accommodate short of a significant burden or expense.

12.     Moreover, during this accommodation period, CTA treated the employees as though they were disabled and entitled to an accommodation which it was obviously able to provide.  Then, often months after the accommodation denial took place but the employee had been working under ADA-qualifying accommodations, CTA would come in and terminate the employee in a quixotic pantomime to become 100% vaccinated, no matter what federal law requires.

13.     Mr. Psomas seeks damage, including back pay, front pay, liquidated damages, punitive damages, lost benefits, compensatory damages, damages for emotional distress, pain and suffering, reasonable attorneys' fees and costs, declaratory relief, injunctive relief, as well as any other relief to which he and his putative class members are entitled.

PARTIES

14.     Plaintiff Jim Psomas is and was at all times relevant to this matter a resident of the State of Illinois residing in Cook County.

15.     Defendant Chicago Transit Authority is a governmental entity, having a principal place of business at 567 W. Lake St., Chicago, IL 60661.  At all relevant times herein, Defendant employed Plaintiff and the members of the putative classes.

JURISDICTION AND VENUE

16.     This action is authorized and instituted pursuant to the ADA, 42 U.S.C. § 12101, *et seq.* This Court has jurisdiction pursuant to 28 U.S.C. § 1331 over federal questions raised under the ADA and over class claims raised pursuant to Rule 23.

17.     Venue is proper in the Northern District of Illinois under 42 U.S.C. § 2000e-5(f)(3). CTA maintains significant operations in the Northern District and this District is where CTA personnel who committed the unlawful employment practices were located when engaging in the discriminatory practices alleged herein within this District.

BACKGROUND

**A.     Plaintiff and His Need for an Accommodation**

18.     Jim Psomas joined CTA in July 2015. He was the Director of Enterprise Applications and the IT project management office.

19.     Throughout his career, Mr. Psomas performed well in his role, was qualified for his job, and had an exceptional performance record.

20.     He had been fulfilling his role as an IT director from home since the beginning of the pandemic in March 2020.

21.     As Mr. Psomas explained to CTA, he suffers from a complex medical condition involving Hashimoto's Disease—an autoimmune disorder—and severe heart-related conditions (which have led to multiple emergency room visits since the onset of the palpitations in 2005). At the time he was being asked to take the vaccine, he also had just received test results indicating a greater than 20% chance that he had thyroid cancer and his doctors at the Mayo Clinic had recommended he be checked every few months regarding that diagnosis.

22.     Hashimoto's Disease is an autoimmune disorder affecting the thyroid gland.  The thyroid—a butterfly-shaped gland located at the base of the neck just below the Adam's apple—produces hormones that help regulate many functions in the body.  The disease leads to symptoms such as pain, fatigue and sluggishness, goiter, joint pain, and weakness.  At the same time, his heart condition involves severe palpitations resulting in dizziness and shortness of breath.  Mr. Psomas has experienced all of these and lives with the effects of the disease every day.

23.     The foregoing medical conditions impact his daily life functions, impacting major life activities.

24.     As demonstrated by Mr. Psomas's medical records, his medical impairment is neither transitory nor minor.

25.     In consultation with his medical team, Mr. Psomas determined that he could not take a COVID-19 vaccine.  Hashimoto's Disease and heart palpitations had been linked to severe adverse reactions known as a cytokine storm in individuals with his conditions.  This is where the body, in reaction to the vaccine, creates an uncontrolled and excessive release of pro-inflammatory signaling molecules called cytokines.  While inflammation is a common immune response, a cytokine storm is where too many of the cytokine proteins are released and can be life-threatening.

26.     CTA did not engage in any interactive process calculated towards finding a reasonable accommodation for that request, which the company would have identified had it engaged in an actual good faith accommodation process (including continued remote work).

27.     As a direct and proximate cause of CTA's discriminatory actions, Psomas's finances were significantly and negatively impacted.

28.     In addition to financial loss, Mr. Psomas suffered emotional and psychological harm while still employed at CTA from the months of uncertainty and repeated coercion to

6

abandon his medical needs in order to preserve his livelihood and career. As a result of the discriminatory treatment he experienced, Mr. Psomas suffered from emotional distress which is or has been marked by some combination of feelings of despondency, social anxiety, loss of interest in leisure activities, and feelings of agitation, and irritability.

29. Following his unlawful termination, Mr. Psomas suffered emotional and psychological harm from his time of unemployment (in addition to the harm perpetrated on him by CTA prior to terminating him and contesting his unemployment).

30. Mr. Psomas has completed the EEOC process and obtained a right to sue letter for this action.

**B.     Defendant's Policy and Resulting Action Against Plaintiff**

31. CTA is an independent governmental agency created by Illinois state legislation and operates the Chicago public transit system, both bus and rail.[1]

32. CTA employs more than 10,000 people.[2]

33. On September 3, 2021, the CTA announced that all its employees would have to receive a COVID-19 vaccine.

34. Mr. Psomas requested an accommodation from the CTA Accommodation Review Committee on September 13, 2021, shortly after the policy was introduced.

35. The Committee returned a recommendation that Mr. Psomas's request be denied. According to the Committee, "Mr Psomas's request d[id] not provide a contraindication reason not to administer vaccine in accordance with guidance from Centers for Disease Control and Prevention."

---

[1] CHICAGO TRANSIT AUTHORITY, *About us*, https://www.transitchicago.com/about/.

[2] CHICAGO TRANSIT AUTHORITY, *Facts at a glance*, https://www.transitchicago.com/facts/.

36.    The Committee was apparently confused about what the ADA requires versus the list of contraindications noted on the CDC's website.  The CDC was merely providing examples of known contraindications in the context of allergic reactions.[3]  Those examples are applicable to the general population and were hardly intended to override specific physician diagnoses and recommendations for individuals subject to disabilities, and certainly did not relieve CTA of its obligations under the ADA to provide an accommodation.

37.    It is of course the case that someone may have a disability preventing them from taking the vaccine that is not a "contraindication" (*i.e.*, allergic condition) for the COVID-19 vaccine.  Nevertheless, CTA determined that it should substitute itself into the medical process and make those determinations on behalf of its employees—in violation of the ADA.

38.    Moreover, CTA should—at the least—have been following all CDC Guidance, not just that cherry-picked in favor of a 100% vaccination policy.  Instead, CTA ignored the science behind the vaccinations and their inability to stop COVID-19 transmission.  Indeed, the CDC stated in August 2021 that COVID-19 vaccines work "with regard to severe illness and death— they prevent it.  But what they can't do anymore is prevent transmission."[4]

39.    It is also noteworthy that *the CDC itself never had an absolute vaccination policy in place and never terminated a single unvaccinated employee*, even ones without medical or religious reasons not to take the vaccine.  In fact, by the time CTA followed through with terminations of unvaccinated employees—including Mr. Psomas—the CDC had already stopped asking employees for their vaccination status altogether.

---

[3] *See Interim Clinical Considerations for Use of COVID-19 Vaccines Currently Approved or Authorized in the United States: Contraindications and precautions*, https://www.cdc.gov/vaccines/covid-19/clinical-considerations/covid-19-vaccines-us.html#Contraindications.

[4] Statement by Rochelle Walensky, U.S. Centers for Disease Control, CNN Interview (Aug. 5, 2021).

40.     Nevertheless, despite the law and the science, CTA notified Mr. Psomas that it was denying his accommodation request on October 14, 2021.

41.     Mr. Psomas appealed that decision, seeking information on who was medically qualified to be making the determination that his condition did not qualify as a "contraindication" to avoid the COVID-19 vaccine.

42.     The Committee notified Mr. Psomas that its decision was "final and binding" on November 16, 2021.  The form denial was cut and pasted into a letter reiterating that he "did not specify a reason why [he] was medically unable to receive the COVID-19 vaccination or how [his] medical condition [wa]s contraindicated to the COVID-19 vaccination."  This was despite the substantial medical information, records, and explanation provided to CTA.  At no point did CTA engage with Mr. Psomas on the substance of his request other than to confirm its confusion regarding the CDC's contraindication list.

43.     In the meantime, however, CTA actually accommodated Mr. Psomas for several months.  He had been working from home during the pandemic and was allowed to continue working under those conditions even after CTA's self-imposed deadline to vaccinate arrived.

44.     CTA then revoked the functional accommodation it had provided and suspended Mr. Psomas on January 24, 2022.

45.     In so doing, CTA did not engage in a good faith interactive process with Mr. Psomas or assess what accommodation options were available.

46.     CTA's policy to revoke previously granted accommodations for virtually every employee requiring an ADA-based accommodation without individualized assessment, was Defendant's unlawful standard operating procedure.  *See Isbell v. John Crane*, *Inc*., 30 F. Supp. 3d 725, 734 (N.D. Ill. 2014) (granting motion for summary judgment *in favor of plaintiff's* failure

to accommodate claim as to liability where employer had previously assessed and confirmed plaintiff possessed a qualifying disability and provided an accommodation, but thereafter revoked the accommodation). That is exactly what happened here, but on a class-wide basis.

47. At that time, Mr. Psomas as "provided Employee EAP and COVID Fact Sheet of risks of being unvaccinated." CTA evidently already realized that the only potential justification left at that point for requiring vaccination was some unidentified level of personal protection. Yet CTA was still attempting to coerce Mr. Psomas into following its discriminatory policy based on partial CDC guidance.

48. Had CTA been following everything the CDC provided, CTA would have realized that Mr. Psomas's prior COVID-19 infection left him with superior immunity to that provided by the COVID-19 vaccines (especially against the Omicron variant which, at that time, had already rendered the prior COVID-19 vaccines inept).

49. But CTA again ignored the CDC—most importantly the CDC's recognition that a prior COVID-19 infection provides protection superior to a vaccine alone.[5] That means unvaccinated individuals with a previous COVID-19 infection unquestionably have a greater immunity to the virus than those previously vaccinated but who have not gotten booster shots.

50. Mr. Psomas was terminated on January 31, 2022.

51. Despite maintaining a policy requiring "compli[ance] with all federal and state laws forbidding discrimination," CTA terminated or forced the retirement of all claims brought by

---

[5] *See* CDC, *COVID-19 Cases and Hospitalizations by COVID-19 Diagnosis—California and New York, May– November 2021* ("**CDC Report**"), https://www.cdc.gov/mmwr/volumes/71/wr/mm7104e1.htm?s _cid=mm7104e1_w (noting that "[b]y October [of 2021], persons who survived a previous infection had lower case rates than persons who were vaccinated alone").

employees seeking a medical accommodation from the Mandate. CTA eventually claimed that one out of around 120 medical requests were granted.

52.     As of February 2022, no accommodation requests had been granted, but the company continued allowing unvaccinated individuals to work at CTA while it was in the process of firing them, so long as they complied with masking and testing requirements during that time. Unvaccinated employees were given functional accommodations with most being required to test once a week and provide proof of a negative COVID-19 test to CTA.

53.     At the highest levels of the company, CTA willfully pre-determined that it would not perform individualized assessments of each unvaccinated employee's specific circumstances to determine whether a reasonable accommodation option was available. CTA failed to conduct individualized accommodation assessments for those seeking and requiring medical accommodations, like Mr. Psomas.

54.     CTA could have accommodated the requests of Plaintiffs and those similarly situated without any hardship whatsoever through, among other available options: (1) continue using periodic COVID-19 testing as CTA had been and continued doing through the Summer of 2022 (which is a more reliable assurance of workplace safety than vaccination anyway)—and testing was available for free or could have been paid for by employees); (2) enhanced safety protocols for face-to-face meetings with CTA employees or the general public, as those in place before the vaccination mandate; (3) continued remote work; (4) voluntary schedule swapping with vaccinated employees or employees demonstrating a negative COVID-19 test in the rare event in-person contact was required as a core job function; (5) recognition of natural immunity as an accommodation option; or (6) any combination of the above options.

11

55. CTA adhered to contact tracing requirements throughout the pandemic. Thus, it likely knew that its vaccinated employees were contracting and spreading COVID-19 at similar or even higher rates relative to its unvaccinated employees, and certainly higher than employees possessing natural immunity.

56. Despite actual knowledge of transmission risk amongst its vaccinated employees, CTA stopped its contact tracing for COVID-19 infections and pre-determined that it would not have to worry itself with tracking unvaccinated employees. CTA was not really concerned about "workplace safety," but rather was driven by a desire to rid itself of employees with medical conditions precluding vaccination that the company simply would not tolerate under any circumstances. CTA utilized the Mandate as a convenient vehicle to accomplish its unlawful corporate goals to purge the maximum number of employees with medical conditions precluding vaccination as possible.

57. Considering that multiple accommodation options were available that would have imposed less than a *de minimis* burden, and the inauthenticity of any proposed undue hardship assertions, CTA acted with malice and recklessly disregarded Plaintiffs and those similarly situated rights under ADA.

58. Upon information and belief, other companies across the country that implemented vaccination mandates: (a) recognized the COVID-19 vaccines inability to prevent infection and transmission, and/or (b) instituted testing protocols applicable to vaccinated and unvaccinated employees alike, and (c) granted the accommodation of regular testing for COVID-19.

59. Regular testing as an accommodation option was even allowed by healthcare providers across the country, including those in Alabama, Colorado, Texas, Florida, and California, for employees who worked with the most vulnerable to COVID-19 in the country. It

would have been even easier for CTA who had many employees working remotely, behind barriers from other people, or working primary (or exclusively) by themselves.

60.     Further exacerbating the situation here, upon information and belief, CTA did not validate, beyond a surface level review, employees who claimed to be fully vaccinated.  On belief, some employees who claimed to be vaccinated against COVID-19 did not receive a COVID-19 vaccine.

61.     Upon information and belief, for those CTA employees who submitted vaccination documents as proof of compliance with the Mandate, CTA failed to validate the authenticity of the submitted vaccination cards.  On belief, there were CTA employees who obtained fake vaccination cards instead of actually injecting a mandated vaccine into their bodies.

62.     Upon information and belief, CTA had knowledge (actual and/or constructive) that employees were submitting fake vaccination cards.  Nonetheless, while claiming the safety of its workforce depended on universal vaccination, CTA did nothing to ensure employees were not submitting fake proof of vaccination.

63.     CTA likewise did not validate that those who had submitted a vaccination card had actually elicited an immune response to the vaccine.  CTA did not require that vaccinated employees had generated antibodies against COVID-19.  But CTA had actual or constructive knowledge that many unvaccinated employees had elicited a strong immune response and had generated antibodies against COVID-19.

64.     CTA had actual or constructive knowledge that free testing was available for its workforce during the relevant timeframe.

65.     Further, in December 3, 2021, the White House had announced plans for full reimbursement of COVID-19 testing costs for employers.[6]

66.     In addition, many employees requiring medical accommodation notified CTA that they would personally cover any testing costs associated with their respective accommodation if necessary.

67.     Mr. Psomas would have paid for his own testing costs if CTA had given him that option as part of a reasonable accommodation.

68.     On January 10, 2022, President Biden's Department of Health and Human Services ("**HHS**") announced that as of January 15, 2022, all health insurers would be required to cover the full cost of at-home COVID-19 testing.[7]

69.     On information and belief, time spent tracking COVID-19 infections (and any purported and attendant administrative burden), was overwhelmingly attributed to vaccinated employees.  Thus, any purported administrative burden associated with tracking testing would be disproportionately associated with vaccinated employees.

70.     In justifying its vaccination mandate, CTA explicitly stated that the available vaccines were "safe."  CTA had actual and/or constructive knowledge at the time that the COVID-19 vaccines could not be guaranteed as safe, and in fact were not "safe" by any objective or reasonable measure.

---

[6] *See* CNBC, *How to get the free at-home COVID tests promised by the White House,* (December 3, 2021), available at https://www.cnbc.com/2021/12/03/how-to-get-the-free-at-home-covid-tests-promised-by-white-house-.html (last accessed May 24, 2024).

[7] *See* U.S. Department of Health and Human Services Press Release, *available at* https://www.hhs.gov/about/news/2022/01/10/biden-harris-administration-requires-insurance-companies-group-health-plans-to-cover-cost-at-home-covid-19-tests-increasing-access-free-tests.html (last accessed May 24, 2024).

71.     Despite actual and/or constructive knowledge of adverse events related to the COVID-19 vaccine readily available, CTA required that medically vulnerable employees submit to vaccination as a condition of employment.

72.     Emergency Use Authorization ("**EUA**") Fact sheets ("**EUA Fact Sheets**") required for providers of the Pfizer, Moderna, and J&J COVID-19 vaccines, all contain a list of possible adverse reactions, including the possibility of severe allergic reaction.

73.     CTA also had actual and/or constructive knowledge of vaccine adverse events through other sources, specifically through the Vaccine Adverse Event Reporting System ("**VAERS**").

74.     VAERS was established in 1990 and is overseen jointly by the CDC and the Food and Drug Administration ("**FDA**").

75.     VAERS provides a platform for individuals and healthcare providers to report adverse events to vaccines.  The platform collects and aggregates the data of adverse events relating to all vaccines, including the COVID-19 vaccines.

76.     As of October 26, 2021, the number of deaths reported to VAERS as a result of the COVID-19 vaccines totaled over 13,422, while the total number of reported deaths from 30 years of VAERS reporting for all other vaccines totaled 9,183.  In less than a full year of administration of the COVID-19 vaccines, there were over 4,000 more deaths reported after a COVID-19 vaccine than that for all vaccines administered over 30 years, combined.

77.     When CTA instituted its vaccination mandate in September of 2021, approximately 623,341 adverse events relating to the COVID-19 vaccine were reported to VAERS.  These adverse events included approximately: 13,627 COVID-19 vaccine related deaths, 55,821 COVID-19 vaccine related hospitalizations, 74,368 COVID-19 vaccine related urgent care visits,

17,794 COVID-19 vaccine related cases of permanent disability, and 14,105 other life-threatening COVID-19 vaccine related incidents.

78.     On the date CTA instituted its vaccination mandate, VAERS data was publicly available and had been reported in the news.  Many CTA employees—including Mr. Psomas—reported the shocking VAERS adverse event rates to CTA management.

79.     Moreover, the precise "counterindication" for taking the vaccine highlighted by Mr. Psomas to CTA was shown in the VAERS data.

80.     Despite knowledge of actual and suspected adverse events, CTA instituted its COVID-19 vaccination requirement on its employees, communicating that the COVID-19 vaccine was "safe."

81.     The VAERS underreporting problem is further supported by the CDC's own safety data related to the COVID-19 vaccines.

82.     On or around December 13, 2020, the CDC introduced its smartphone-based program for COVID-19 vaccine recipients called "V-safe." The program allows for users to "quickly and easily share with CDC how you, or your dependent, feel after getting a COVID-19 vaccine."

83.     Out of the 10,094,310 registered users who submitted data to V-safe, 782,913 users (over 7.7%), reported a health event requiring medical attention, emergency room intervention, and/or hospitalization.

84.     Over 25% of V-safe users had an event requiring them to miss school or work, and/or prevented normal activities.

85.     Upon information and belief, CTA's own business records reflect employees who received a COVID-19 vaccine experienced similar rates of adverse events as revealed in the CDC's V-safe data.

86.     CTA reviewed medical accommodation requests and provided temporary accommodations at the least.

87.     After assessing the medical conditions of employees who submitted a medical accommodation request, CTA denied 100% (or virtually 100%) of all accommodation requests submitted by members of the putative class.

88.     CTA then took additional adverse employment action against many members of the class by terminating them.

89.     CTA treated these terminations as though they were "for cause" and/or that terminated employees had "voluntarily resigned."

90.     When terminated employees applied for unemployment benefits, CTA retaliated further against them by opposing claims for unemployment (even though it was CTA that had needlessly forced them out).

91.     As a result of CTA's decision to wrongfully terminate or force into retirement these employees—or, even worse, coerce them into taking the vaccine—class members suffered extended periods of lost wages, lost 401(k) contributions, lost vacation time, lost healthcare benefits, and future lost wages.  Terminated employees also suffered because of the stress and anxiety of losing their jobs and finding new employment, and because of CTA's continued attack against their unemployment benefits.  Finally, those pressured into taking the vaccine in violation of the law have suffered emotionally and irreparably with respect to their health.

## CLASS ALLEGATIONS

92.     Mr. Psomas brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of himself and on behalf of all other persons similarly situated.

93.     The proposed Class is described in full below, with Plaintiff reserving all rights.

94.     CTA subjected Mr. Psomas and the Disability Class to a uniform pattern and practice of discrimination and retaliation.

95.     From the top levels of the company, CTA instituted and enforced a 100% no accommodation policy, unwilling even to consider how to accommodate those with medical needs requiring accommodation from the Mandate.

96.     CTA received approximately 120 requests for medical accommodation to its vaccination mandate, but decided that it would not accommodate any Class member, regardless of their essential job duties, location, natural immunity, access to free or low cost COVID-19 testing, remote work status, ability to work remotely, and/or any individual circumstances.

97.     As a result of its predetermined 100% no accommodation policy, CTA denied virtually every accommodation request and demanded that each member of the putative class abandon their medical needs if they desired to preserve their career.

98.     As a result of CTA's unlawful pattern and practice of rejecting accommodation requests, Disability Class members faced the ongoing coercion resulting from the immense societal and financial pressure, the prospect of unemployment in a difficult job market.

99.     In these specific circumstances, the blanket denial of accommodation requests constituted adverse employment action because CTA made the unlawful decision to analyze the requests as whole instead of conducting an individualized analysis, and then engaged in an ongoing coercion campaign against Disability Class members.

18

100.    Many members of the Disability Class were ultimately terminated, an additional adverse employment action.

101.    CTA forced other members of the Disability Class to violate their health needs and receive a COVID-19 vaccine to preserve their careers, an additional adverse employment action. Members of the Disability Class who CTA coerced into taking the vaccine will live with the consequences of CTA's coercion for the rest of their lives.

102.    CTA then further retaliated against members of the Disability Class by contesting unemployment benefits so as to further make the pain of CTA's lawless actions felt by members of the class standing up for their medical needs.

103.    Mr. Psomas, on behalf of himself and those similarly situated, proposes the following definition, subject to amendment as appropriate, for the Disability Class:

>    **All CTA employees who: (1) submitted a medical exemption request to the Mandate; and (2) were denied an accommodation without a good-faith interactive process.**

104.    Mr. Psomas reserves the right to modify or amend the definition of the proposed Class before moving for class certification and before the Court determines whether certification is appropriate.

105.    Excluded from the Class and Sub-classes are: (a) any officers, directors or employees, or immediate family members of the officers, directors, or employees of Defendant or any entity in which Defendant has a controlling interest; (b) any legal counsel or employee of legal counsel for the Defendant; and (c) the presiding Judge in this lawsuit, as well as the Judge's staff and their immediate family members. The "Class Period" begins on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, discovery, concealment, and accrual issues, and ends on the date of entry of judgment.

106.    The proposed class meets the criteria for certification under Fed. R. Civ. P. 23 (a) and (b).  Issue certification under Rule 23(c)(4) may also be appropriate, should the Court deem necessary.

107.    **Numerosity:** The class members are so numerous that joinder of all members is impracticable.  Based on information and belief, the Disability Class consists of more than 120 current and former employees of CTA who sought accommodation to the Mandate and were rejected without a good-faith interactive process.  The identities of the class members are ascertainable through CTA's records, class members' records, publication notice, self-identification, or other means.

108.    **Commonality:** There are questions of law and fact common to the Disability Class which predominate over any questions affecting only individual class members.  The common questions of law and fact include, without limitation:

a)  Whether CTA engaged in the conduct alleged herein;

b)  Whether CTA instituted a 100% no accommodation policy;

c)  Whether requiring Disability Class Members to comply with the Mandate violated the ADA, regardless of whether any particular individual was disabled, because CTA treated the unvaccinated individuals as though they were disabled in violation of 42 U.S.C. § 12101(3)(A);

d)  Whether CTA instituted its no accommodation policy when it knew or should have known that the mandated COVID-19 vaccines were incapable of preventing transmission or infection, and knew or should have known that its vaccinated employees were contracting and spreading COVID-19 at very high rates during the relevant timeframes;

e) Whether CTA knew or should have known that its vaccinated employees were contracting COVID-19 at the similar or higher rates than its unvaccinated disabled employees during the relevant timeframes;

f) Whether CTA knew or should have known during the relevant timeframe that regular testing was a more effective countermeasure against COVID-19 than vaccination;

g) Whether CTA knew or should have known that tests for COVID-19 infection were available at low or no costs throughout the country and where CTA operated its business;

h) Whether CTA knew, or should have known, that recognition of natural immunity was a suitable and equally, if not more effective, alternative to COVID-19 vaccination that would not have entailed any cost to CTA to allow as an accommodation option;

i) Whether CTA instituted an exemption/accommodation process that refused to account for each employee's individual circumstances;

j) Whether CTA proceeded with reckless disregard for the ADA rights of its employees with recognized medical impairments precluding vaccination;

k) Whether CTA knew or should have known at the time it took adverse employment action against members of the Disability Class that its vaccinated employees were contracting and spreading COVID-19 at similar, or higher rates than its unvaccinated employees;

l) Whether CTA had financial incentives (or penalties) tied to contracts with the federal government that pretextually influenced the shaping, implementation,

and ultimate results of the accommodation process, rather than a good-faith individualized assessment of whether the company could accommodate each individual applicant without undue hardship;

m) Whether CTA decision to terminate unvaccinated employees who were working 100% remotely demonstrates evidence a pattern and practice of disability-based discrimination;

n) Whether CTA implemented security protocols to ensure that all employees claiming to be vaccinated for COVID-19 in fact received the injections and did not submit fake vaccination cards;

o) Whether CTA only supposedly followed federal guidance related to the vaccines and employment policies (*e.g.*, from the CDC and EEOC) when convenient to enact its discriminatory policies, and declined to follow federal guidelines when doing so would be inconvenient to it discriminatory objectives (*e.g.*, failing to implement a vaccination booster requirement and disregarding EEOC guidance against taking adverse employment action against the Disability Class);

p) Whether CTA conducted antibody testing of all vaccinated employees to confirm that all who received the COVID-19 vaccine actually elicited an immune response; and

q) Whether CTA engaged in class-wide discrimination against the Disability Class by classifying terminations as "for cause" or "misconduct" so as to preclude their ability to receive unemployment benefits in relevant state unemployment proceedings.

109.     **Typicality:** Mr. Psomas's claims are typical of those of other putative Disability Class members because they each sought medical accommodation to the Mandate and CTA chose not to provide an accommodation without engaging in a good-faith interactive process since it had already determined that no permanent accommodations would be given.  Yet, at the same time, CTA treated all unvaccinated employees—who remained with the company for months—as disabled by providing them the temporary accommodations of masking and testing.  This means that every Disability Class member's claims arise from the same course of discriminatory conduct and more specifically, the same single decision, to deny all accommodation requests without any type of individualized analysis of whether CTA could accommodate them without undue hardship. Were it otherwise, those who worked completely remotely would have been easily accommodated. Further—because it cannot be disputed that the mandated vaccines were incapable of preventing infection and transmission of the targeted pathogen—regular testing is a more accurate and reliable assurance of workplace safety than vaccination.  Free and low COVID-19 testing was available throughout the country during the relevant timeframes.  Thus, testing was an accommodation option that applied class-wide, regardless of job duty, an option that should have been implemented for vaccinated and unvaccinated employees alike because CTA cannot dispute that its it vaccinated employees were contracting COVID-19 during the relevant timeframes.  If workplace safety was the goal, testing was the countermeasure to be implemented, and was an accommodation option that would have been less than a de minimis burden to implement.  Plaintiff and all members of the putative Class have been similarly affected by Defendant's common course of conduct alleged herein.  Plaintiff and all members of the putative Class sustained monetary and economic injuries.

110.     **Adequacy:** Mr. Psomas will fairly and adequately represent and protect the interests of the Disability Class members.  Like members of the putative class, Mr. Psomas sought

an exemption/accommodation and was subjected to CTA's class-wide discriminatory policies with adverse employment actions. Plaintiff's Counsel is competent and experienced in litigating class actions and is experienced in civil rights and employment litigation of this kind. Further, Plaintiff and his counsel are committed to the vigorous prosecution of this action. Plaintiff has no conflicts of interest or interests adverse to those of putative Class or Sub-classes.

111. **Insufficiency of Separate Actions:** Absent a class action, Plaintiff and members of the Class will continue to suffer the harm described herein, for which they would have no remedy. Even if individual consumers could bring separate actions, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated consumers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendant.

112. **Predominance:** Moreover, CTA has engaged in a common course of conduct toward the Disability Class, in that they all were subjected to the same overarching Mandate and subjected to CTA's class-wide discriminatory policies with adverse employment actions. Importantly, CTA unequivocally expressed ahead of time that it would not be tracking unvaccinated individuals in the company because they would not exist. The common questions of fact and law arising from CTA's discriminatory conduct affecting the Disability Class members outlined in this Complaint thus predominate over any individual issues and can be resolved through common answers to those questions. CTA failed to engage in any individualized analysis of whether each individual Disability Class member's requested accommodation would amount to an undue hardship, and CTA could have accommodated every putative class member short of undue hardship—regardless of job role—through any of the low cost and no-cost accommodation options

24

available (most notably, COVID-19 testing).  Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

113.  **Superiority:** Finally, a Class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Class treatment of common questions of law and fact is superior to the inevitable individual actions resulting in piecemeal litigation—especially here when Mr. Psomas will make claims that would otherwise be repeated and CTA will present the same exact same defenses for why it could not engage in a good-faith interactive process with disabled employees (or those the company regarded as disabled).  Absent class certification, Disability Class members would find that the cost of litigating their individual claims against one of the largest employers in the country to be prohibitively high and would therefore be without remedy.  Class action in a single district will also provide some consistency and uniformity of remedy among class members and avoid inconsistent standards applied to CTA's conduct.  The prosecution of single actions by individual Class members in seriatim cases would create a risk of inconsistent or varying adjudications with respect to individual class members, which would establish incompatible standards of conduct for CTA.  In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources, and the parties' resources, and protects the rights of each Class member.  A class action is superior to litigating potentially a multitude of claims in this district that are based on the same set of operative facts and the same corporate disability-based accommodation scheme.

114.  In the alternative to those claims seeking remedies at law, Plaintiffs and Class and Sub-class Members allege that no plain, adequate, and complete remedy exists at law to address Defendant's unlawful and unfair business practices.  The legal remedies available to Plaintiffs are

inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief. *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937).

**CLAIMS FOR RELIEF**

**COUNT I**

**Violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*
Disability discrimination – failure to accommodate ADA disability**

***(On behalf of Plaintiff and Disability Class Members)***

115.     Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

116.     This claim is brought by Mr. Psomas and on behalf of the Disability Class.  CTA engaged in a comprehensive pattern and practice of disability discrimination through refusing to accommodate at least 120 of its employees requiring a medical accommodation, even though there were many no-cost and low-cost accommodation options available.

117.     Testing was a low-cost/no-cost accommodation option that was available regardless of job role and one that the company used for months with many employees as it bought time to terminate them.  Critically, this was also a more effective countermeasure against COVID-19 than vaccination.  This is confirmed by the fact that CTA cannot dispute that its vaccinated employees were contracting COVID-19 at very high rates during the relevant timeframes, at similar or higher rates than unvaccinated disabled employees, like Mr. Psomas.

118.     Because CTA knew the strong majority of COVID-19 cases recorded within its workforce from July of 2021 through November of 2021—as well as an unacceptable relative proportion of positive cases—were attributable to its vaccinated employees, the circumstances surrounding the Mandate's implementation and the mass denial of accommodation requests gives

26

rise to strong inferences of CTA's unlawful motives to rid itself of employees with a disfavored medical condition precluding vaccination.

119.    CTA took adverse employment action against Mr. Psomas and those similarly situated "because of" their disfavored medical conditions.  Indeed, CTA would not even engage in a good-faith interactive process with Mr. Psomas or those similarly situated to see what accommodations might be available.

120.    While a company may be free to institute facially neutral policies (such as a vaccination mandate) as an ordinary matter, it is no response that the subsequent adverse employment action was due to an otherwise-neutral policy.  The ADA requires otherwise-neutral policies to give way to the need for an accommodation.

121.    CTA thus engaged in a comprehensive scheme of discrimination due to its refusal to accommodate the Disability Class's medical impairments precluding vaccination.

122.    As part of this unlawful scheme, CTA failed to perform an individual accommodation analysis for each individual class member to determine if accommodating them would result in an undue burden, even though many low cost and no-cost accommodation options were available, and every member of the Disability Class could have been accommodated short of undue hardship.

123.    CTA has not and cannot provide facts to support that accommodating Mr. Psomas and those similarly situated, would pose a "significant risk to the health or safety of others that [could] not be eliminated by reasonable accommodation."  42 U.S.C. § 12111(3).

124.    Because Mr. Psomas and those similarly situated, were able to continue the essential function of their jobs without needing to show proof of COVID-19 vaccination, or proof

27

of a negative COVID-19 test, CTA could have simply accommodated Mr. Psomas and those similarly situated without significant difficulty or expense.

125.    CTA did not prove—and, especially given their prior COVID-19 infections, cannot prove—that Mr. Psomas or those similarly situated posed any increased or unacceptable risk of transmitting COVID-19 relative to fellow employees.

126.    CTA engaged in an intentional, company-wide, and systematic policy, pattern, and practice of disability-based discrimination against Mr. Psomas and those similarly situated. Without lawful justification, CTA pretextually determined, as a corporate policy, it could not accommodate him or those similarly situated and decided to purge as many disabled employees as it possibly could while using the Mandate and its unlawful medical accommodation process as its chosen vehicles to accomplish its unlawful goals.

127.    Because CTA cannot provide legitimate justification for its actions, the foregoing conduct constitutes illegal, discrimination prohibited under the ADA.

128.    On belief, multiple CTA employees and attorneys notified CTA that its accommodation-related policies violated the ADA. Nonetheless, CTA charged forward with its mass termination scheme.

129.    CTA's actions were willful, wanton, and/or malicious, and demonstrate reckless disregard for the rights of Mr. Psomas and those similarly situated under the ADA.

130.    Further, as a direct and proximate consequence of CTA's discriminatory conduct, Mr. Psomas and those similarly situated have suffered and are suffering economic and pecuniary damages for which they are entitled to judgment.

131.    In addition, as a direct and proximate consequence of CTA's actions, Mr. Psomas and those similarly situated have suffered and are suffering non-pecuniary damages in the form of

28

emotional suffering, coercion, humiliation, embarrassment, and mental anguish for which they are entitled to recover compensatory damages in an amount to be determined by the jury.

132.     Accordingly, Plaintiff requests relief as hereinafter described.

## COUNT II

**Violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.***
**Disability discrimination – retaliation**

***(On behalf of Plaintiff and Disability Class Members)***

133.     Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

134.     Mr. Psomas engaged in protected activity when he requested medical accommodations from CTA's vaccine mandate.

135.     CTA responded by taking an adverse employment action against him and those similarly situated when it announced that it would terminate their employment for not receiving the vaccine.

136.     CTA's response to Disability Plaintiffs' protected activity was an adverse employment action intended to force employees to forego their medical reasons for not receiving the COVID-19 vaccine.  Further, members of the Disability Class also engaged in a protected activity when they appealed the mass, boilerplate accommodation denial and how CTA was handling the ADA accommodation process—as Mr. Psomas did here.  On information and belief, members of the Disability Class informed CTA before the mass denial of medical accommodation

requests that CTA was ignoring its duties under the ADA and engaging in illegal conduct, an objectively reasonable method in these circumstances to oppose discrimination.

137.    CTA further retaliated against the Disability Plaintiffs—such as Mr. Psomas—by promising, and then following through with the promise, that CTA would contest unemployment benefits for any disabled employee terminated for not taking the vaccine.

138.    The Disability Plaintiffs and those similarly situated were retaliated against because too many sought a disability-based accommodation and CTA viewed medical reasons precluding vaccination as an invalid reason, determined that the volume of medical accommodation requests was unacceptable, and made the company-wide decision to terminate every employee who sought a disability-based accommodation.

139.    CTA further retaliated against Disability Plaintiffs such as Mr. Psomas by not bringing them back to work (or removing the Mandate and testing requirements) when it became apparent to CTA that its vaccine mandate was unnecessary and its lack of accommodations unjustifiable.

140.    CTA's actions were willful, wanton, and/or malicious, and demonstrate reckless disregard for the rights of Disability Plaintiffs and the Disability Class members under ADA.  As such, punitive damages are warranted.

141.    Further, as a direct and proximate consequence of CTA's discriminatory conduct, Disability Class members have suffered and are suffering economic and pecuniary damages for which they are entitled to judgment.

142.    In addition, as a direct and proximate consequence of CTA's campaign of retaliation, Mr. Psomas and the Disability Class have suffered and are suffering non-pecuniary damages in the form of emotional suffering, humiliation, embarrassment, and mental anguish for

which they are entitled to recover compensatory damages in an amount to be determined by the jury.

143.    Accordingly, Plaintiff requests relief as hereinafter described.

## COUNT III

**Violation of the ADA, 42 U.S.C. § 12101, *et seq*.**
**Disability discrimination—discrimination based on perceived disability**

***(On behalf of Plaintiff and Regarded as Disabled Class Members)***

144.    Plaintiff restates the foregoing paragraphs as if set forth fully herein.

145.    This claim is brought on behalf of all employees who were granted temporary disability accommodations by CTA after CTA regarded them as though they were disabled (a "Regarded As Disabled" Class or "**R/A Class**").

146.    Even if Mr. Psomas were not disabled under the ADA, the ADA prohibits employer discrimination against those employees who an employer regards as disabled when the employer acts adversely against that employee because of the perceived disability. *See* 42 U.S.C. § 12102 (1)(C) (defining disability under the Act as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; and (C) being **regarded as** having such an impairment" (emphasis added)).

147.    CTA was very concerned that unvaccinated employees would burden their workforce due to their perceived disabilities. Specifically, after acknowledging members of the R/A Class's medical impairments (and religious employees sincerely held religious beliefs) and providing temporary accommodations under the ADA for several months while it worked on terminating most of them, the company determined members of the R/A Class would not be able to adequately perform the essential functions of their roles without posing an undue hardship on the company moving forward.

148.     If CTA did not perceive members of the R/A Class as though they were disabled, the company would not have forced them to undergo accommodation requirements such as masking and testing while it worked to terminate them at some future point.

149.     CTA acted as though unvaccinated employees with medical impairments would burden the company through, among other things, presenting an increased risk to miss work due to their medical impairments that precluded vaccination, which in CTA's mind would result in decreases to company productivity.

150.     Indeed, CTA apparently viewed all unvaccinated employees as being perpetually infected with COVID-19 and thus needing to be removed from the workplace altogether.

151.     This is precisely the type of conduct Congress sought to eliminate when enacting the ADA. *See, e.g., School Bd. of Nassau County v. Arline*, 480 U.S. 273, 284 (1987)) (with the "regarded as" prong, Congress chose to extend the protections of the ADA to individuals who have no actual disability. The primary motivation for the inclusion of misperceptions of disabilities in the statutory definition was that "society's accumulated myths and fears about disability and diseases are as handicapping as are the physical limitations that flow from actual impairment.").

152.     Members of the R/A Class received written confirmation from CTA that it acknowledged each Member's stated medical impairment as qualifying for ADA protections by way of the company's use of temporary reasonable accommodations.

153.     In acknowledging the asserted disability and temporarily accommodating the R/A Class, CTA regarded R/A Class Members as disabled.

154.     By its actions, CTA demonstrated that it viewed members of the R/A Class as though they possessed a disability that was neither transitory nor minor (by announcing that the

32

company would be terminating them because it perceived their medical conditions as a long-term liability to accommodate).

155. CTA treated members of the R/A Class as though they presently were and for the indefinite future would be incapable of performing the essential functions of their jobs because of the medical impairments that precluded vaccination.

156. CTA thereby discriminated against Plaintiffs because of an imagined disability that was neither transitory nor minor as CTA believed it impacted the major life function of working.

157. Instead of making individualized assessment, CTA made a corporate decision to rid itself of every employee that was or potentially was disabled.

158. By limiting, segregating, and classifying employees in a manner that adversely affected their employment opportunities based on an imagined disability, CTA engaged in disability-based discrimination in violation of the ADA, thereby harming the R/A Class.

159. CTA cannot demonstrate, short of hypotheticals and speculation, that R/A Class Members posed a direct threat to the workplace. This is especially true for employees who possessed natural immunity as their immunity provided equal or superior protection to vaccine-based immunity (and in any event, because vaccinated employees were contracting COVID-19 at very high rates during the relevant timeframes, unvaccinated employes, regardless of natural immunity status, did not pose an outsized relative risk). More specifically, during the relevant timeframes, CTA's vaccinated employees were contracting COVID-19 at very high rates, meaning that R/A Class Members posed no more of a direct threat to the workforce or others than their vaccinated colleagues.

160. CTA engaged in an unlawful pattern and practice of disability-based discrimination by terminating hundreds of employees on the basis of perceived disabilities.

161.    CTA's actions were willful, wanton, and/or malicious, and demonstrate reckless disregard for the rights of the Disability Class and R/A Class members under the ADA.  As a direct and proximate consequence of CTA's discriminatory conduct, R/A Class members have suffered and are suffering economic and pecuniary damages for which they are entitled to judgment.

162.    In addition, as a direct and proximate consequence of CTA's actions, R/A Class members have suffered and are suffering non-pecuniary damages in the form of emotional suffering, humiliation, embarrassment, and mental anguish for which they are entitled to recover compensatory damages in an amount to be determined by the jury.

163.    Accordingly, Plaintiffs request relief as hereinafter described.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the putative class members pray for relief as follows:

A.    Order CTA to make whole all individuals adversely affected by the unlawful employment practices described above, by providing the affirmative relief necessary to eradicate the effects of their unlawful employment practices, including but not limited to instatement, reinstatement, provide front pay in lieu of reinstatement, or otherwise make whole individuals denied employment because of their disabilities;

B.    Declare that CTA violated the ADA for failure to provide reasonable accommodations to the Disability Class and/or R/A Class;

C.    Declare CTA violated the ADA by failing to engage in a good-faith interactive process, relying instead on a predetermined outcome of 100% denials of accommodation requests;

D.    Declare CTA violated the ADA by retaliating against the Disability Class;

34

E.    Certify the Disability Class and R/A Class under Federal Rule of Civil Procedure 23 (a) (b), and/or certain discrete issues under Rule 23(c)(4) where appropriate;

F.    Designate Plaintiff Jim Psomas as representative of the Disability Class and/or the R/A Class;

G.    Designate Plaintiff's Counsel of record as class counsel for the Disability Class and/or the R/A Class;

H.    Enter a declaratory judgment declaring CTA's actions to be violations of the ADA;

I.    Issue a permanent injunction requiring CTA to discontinue engaging in disability based discrimination against the Disability Class and R/A Class, and to expunge the personnel files of members of the Disability Class and R/A Class of any derogatory, false, or misleading information relating to this matter;

J.    Grant members of members of the Disability Class and R/A Class equitable relief;

K.    Order CTA to provide training for supervisors and managers at all corporate levels specific to ADA disability discrimination;

L.    Award Plaintiff and members of the Disability Class and R/A Class back pay (including interest and benefits), reinstatement or front pay, pre-judgment and post-judgment interest, and compensatory or punitive damages;

M.    Award Plaintiff reasonable attorneys' fees and costs; and

N.    Grant any other relief that the Court deems just, proper, and equitable.

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38 and 29 U.S.C. § 626, Plaintiff demands a jury trial on all issues upon which there is a federal right to a jury trial.

35

November 25, 2024

Respectfully submitted.

*/s/ Lisa Considine*

Lisa Considine
SIRI & GLIMSTAD LLP
745 Fifth Avenue
Suite 500
New York, NY 10151
Phone: (717) 967-5529
Facsimile: (646) 417-5967
dconsidine@sirillp.com

Walker D. Moller*
SIRI & GLIMSTAD LLP
1005 Congress Avenue
Suite 925-C36
Austin, TX 78701
Phone: (512) 265-5622
Facsimile: (646) 417-5967
wmoller@sirillp.com

John C. Sullivan*
S|L LAW PLLC
610 Uptown Boulevard
Suite 2000
Cedar Hill, TX 75104
Telephone: (469) 523-1351
Facsimile: (469) 613-0891
john.sullivan@the-sl-lawfirm.com

Attorneys for Plaintiff

* *Pro Hac Vice Motions forthcoming*